**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

LISETE COLON,

*Plaintiff,* Case No.

v.

HEALTH CARE SERVICE CORPORATION d/b/a
BLUE CROSS BLUE SHIELD OF ILLINOIS,

*Defendant.* /

**COMPLAINT AND JURY TRIAL DEMAND**

Plaintiff Lisete Colon ("Plaintiff") files this action against Defendant Health Care Service Corporation d/b/a Blue Cross Blue Shield of Illinois ("Defendant") as follows:

**NATURE OF THE ACTION**

1. Plaintiff was a highly successful and productive investigator for Defendant in its Special Investigations Department for nearly a decade and earned a promotion to Senior Fraud Investigator. After years of positive performance, Defendant changed course when Plaintiff exercised her rights under the ADA and FMLA. It subjected her to disproportionate workloads, questioned and restricted her disability accommodation, treated her protected leave as "inconsistent work availability," and formally disciplined her. This conduct ultimately created conditions that forced her resignation in August 2025.

2. Defendant's conduct derailed Plaintiff's career and has caused her significant harm. Plaintiff seeks damages against Defendant for its unlawful discriminatory and retaliatory conduct, including the conditions that ultimately resulted in her resignation.

## PARTIES

3. Plaintiff is a resident of Cook County, Illinois. She was Defendant's employee from July 2016 to August 2025. At all times material, she was Defendant's employee within the meaning of the ADA, FMLA, and IHRA.

4. Defendant has a principal address in and headquarters in Cook County, Illinois. Defendant exclusively operates Blue Cross Blue Shield Divisions in five states (Illinois, Montana, New Mexico, Oklahoma, and Texas). It has more than 25,000 employees and provides services to more than 24 million members. At all times material, Defendant was Plaintiff's employer within the meaning of the ADA, FMLA, and IHRA.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

5. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff asserts claims arising under the Americans with Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. §§ 12101 et seq., including 42 U.S.C. §§ 12112 and 12203, and the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 et seq.

6. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's claims arising under the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101 et seq., because those claims arise from the same employment relationship, events, and course of conduct as Plaintiff's federal claims and form part of the same case or controversy.

7. This Court has personal jurisdiction over Defendant because it continuously conducts business and maintains its principal business headquarters within this District.

8. Venue is appropriate in this Court because Defendant is subject to personal jurisdiction in this District and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this District. 28 U.S.C. § 1391.

9. Plaintiff has complied with all conditions precedent in connection with her claims arising from employment discrimination. On July 29, 2025, the EEOC received Plaintiff's signed and filed Charge of Discrimination, Charge No. 440-2025-09774, alleging disability discrimination and retaliation. Plaintiff's Charge was dual-filed with the Illinois Department of Human Rights.

10. On June 10, 2026, the EEOC issued Plaintiff a Determination and Notice of Right to Sue concerning her Charge.

## GENERAL ALLEGATIONS

11. Blue Cross Blue Shield Illinois' ("**BCBSIL**") Special Investigations Department ("**SID**") hired Plaintiff as a Fraud Investigator on or about July 11, 2016. She was promoted to Senior Fraud Investigator in December 2018 and reported to Steven Adams, Senior Manager of Special Investigations ("Sr. Mgr. Adams").

### *A. Plaintiff's Successful Tenure with BCBSIL and Disability Accommodation*

12. Plaintiff received positive performance evaluations from 2016 through 2024.

13. Plaintiff received several achievement awards and had previously investigated cases showcased and presented by law enforcement at SID's annual trainings.

14. As a Senior Fraud Investigator, Plaintiff was responsible for planning and conducting on-site and off-site investigations and audits of potentially fraudulent providers, subscribers, vendors, and employees. Plaintiff planned and coordinated the activities of investigative work; and made recommendations for criminal investigation, recovery, and restitution. She also reviewed operational controls for HCSC subsidiaries and subcontractor divisions and recommended system and internal-control enhancements designed to reduce potential employee, insured, and provider fraud.

15. Defendant designated Plaintiff as a Flex employee, which required that she work in office three days per week.

16. Defendant's reasonable accommodation policy stated that it "provides reasonable accommodations to allow qualified individuals with disabilities to perform essential functions of their job."

17. Defendant's reasonable accommodation policy indicates that Defendant will "keep all medical-related information confidential in accordance with the requirements of the ADA, HIPAA, and applicable state or local laws."

18. Additionally, Defendant's Data Store Policy stated that, "[f]or purposes of this policy HCSC information is information that HCSC is obligated to secure including but not limited to proprietary, PII, and BCI."

19. Defendant's FMLA Policy states that Defendant "cannot use the taking of family and medical leave as a negative factor in employment actions such as hiring, promotions or disciplinary actions related to attendance." The policy further provides that HCSC will return an employee from FMLA leave to the same terms and conditions of employment to which the employee otherwise would have been entitled had leave not been taken.

20. Plaintiff requested her first reasonable accommodation on August 9, 2022, supported by medical documentation that she provided to Defendant regarding a diagnosis that Plaintiff received in childhood and for which she has received treatment.

21. On August 16, 2022, HCSC approved an accommodation for Plaintiff of telecommuting three days per week, office work two days per week, plus a dual-ear headset, through February 17, 2023.

22. On February 28, 2023, Plaintiff submitted another request for reasonable accommodation due to her disability.

23. On March 8, 2023, Plaintiff discussed the accommodation request with Occupational Health Nurse Allison Thompson, who approved her first accommodation request.

24. During the conversation with Occupational Health Nurse Thompson, Colon requested longer work days with one weekday off every other week. Plaintiff has difficulty interrupting complex tasks and later resuming them without additional time to reorient and process where she left off. The 9.5 hour alternate work schedule allowed Plaintiff to work for longer uninterrupted periods, complete complex investigative tasks more efficiently, and reduce errors. The alternate schedule therefore enabled Plaintiff to manage limitations associated with her disability and perform her job effectively.

25. On or about April 4, 2023, Defendant granted Ms. Colon an accommodation that permitted one weekday off every other week and 9.5 hour workdays as an alternative accommodation after a "complete review of your request and the information from your medical provider."

***B. Plaintiff is Assigned a Disproportionate Workload***

26. Plaintiff initially joined the FEP Project temporarily in early 2023 and opened her first FEP case in May 2023. All cases opened prior to that date belonged to two previously assigned co-workers.

27. Tom Kusior was the original investigator assigned to the FEP project. After Kusior requested assistance because of the volume of the FEP workload, Defendant assigned Scott [last name unknown] to assist him.

28. In July 2023, Defendant assigned approximately 270 cases from the other investigators, Tom Kusior and Scott [last name unknown], to Plaintiff in addition to the 80 that she already handled. This created a disproportionate workload compared to other persons in her position.

29. These cases were time-sensitive, requiring immediate review and editing and submission into two different databases. FEP matters were governed by detailed procedures and required Plaintiff to review the referral and underlying information, investigate whether fraud existed, and maintain corresponding information in both Defendant's database and the FEP database. The work was repetitive and time-intensive even when a referral ultimately did not establish fraud.

30. Plaintiff was not provided the same level of support or assistance as the investigators who had previously worked the FEP assignment. This was despite consistently performing more work than her peers.

31. After the reassignment, Plaintiff immediately received over 400 emails which required immediate review or response.

32. The disproportionate workload continued, increasing to where Plaintiff had 336 open FEP cases, 18 non-FEP cases, and 388 open records and referrals.

33. She requested another reasonable accommodation due to her disability on October 6, 2023. Her accommodation request for a temporary 100 percent telecommuting accommodation was granted on October 23, 2023, until November 5, 2023.

34. By January 2024, Defendant increased Plaintiff's caseload to more than 400 open FEP project cases.

35. Plaintiff requested additional assistance and investigatory support as the investigator who had previously worked on the FEP project before did have help, but Defendant did not provide her with any.

36. By June 2024, Plaintiff had more than 270 open cases.

37. After the promotion of Tom Kusior from Lead Investigator to Manager in Plaintiff's department in July 2024, Defendant gave Plaintiff the largest reassignment of Kusior's cases, which increased her caseload to nearly 300 open matters.

38. During this time, Plaintiff also carried out additional duties including prescription review, Spanish translations, and information retrieval.

### *C. Plaintiff Takes Protected FMLA Leave, Returns, and is Retaliated Against*

39. Defendant approved Plaintiff for continuous FMLA leave from April 28, 2025, until June 6, 2025. Plaintiff requested the leave to care for her daughter due to her daughter's chronic, serious health condition which required significant care and therapy. Defendant knew the reason for her FMLA leave. Plaintiff later took a second approved period of FMLA leave for the same purpose.

40. On July 9, 2025, Plaintiff emailed her manager Sr. Mgr. Adams and asked whether she could change her alternative day off because she had no remaining PTO available following her recent period of FMLA leave.

41. Sr. Mgr. Adams responded that, given Plaintiff's "inconsistent work availability" over the past several months, he was unsure whether her accommodation was still effective. At the time Sr. Mgr. Adams made this statement, Plaintiff had recently returned from approximately five weeks of Defendant-approved FMLA leave. Plaintiff's FMLA leave accounted for a substantial

portion of the period Sr. Mgr. Adams characterized as "inconsistent work availability." Sr. Mgr. Adams knew Plaintiff had taken that leave to care for her daughter.

42. Plaintiff responded to Sr. Mgr. Adams' email stating that her:

> "work schedule is an ADA accommodation if it was reviewed, [Colon] was never informed. [Colon's] inconsistent work availability for the past few months was due to FMLA unpaid leave that I advised you and HR of ahead of time. I use my PTO when I have it I do not ask for special treatment. I provided several options because I care about my work. I think very highly of you and always have. I do not ask for favors and everyone knows that. This email is so disappointing in more than one way. This email dismisses my ADA accommodation, my disability and my FMLA leave. My ADA accommodation, FMLA, and disability cannot be ignored, and they cannot be used as leverage to intimidate me or anyone."

This e-mail was also forwarded to Lynn O'Dea, Executive Director of Special Investigations ("Dir. O'Dea"), Shontelle Mixon, DSVP of Internal Audit and Special Investigations ("VP Mixon").

43. While Plaintiff was on FMLA leave, Defendant reassigned at least three of her cases, including an investigation she had spent significant time and resources in completing before she went on leave. Plaintiff had opened and was actively working on one of the reassigned investigations before beginning FMLA leave.

44. While Plaintiff was on FMLA leave, Sr. Mgr. Adams informed an individual outside SID that Plaintiff was on FMLA leave and indicated that the investigation could be reassigned if she did not return promptly. Plaintiff's leave was approved for an additional week, she timely returned, and the case was nevertheless subsequently reassigned.

***D. Plaintiff Complains of Disability and FMLA Retaliation***

45. On July 9, 2025, Plaintiff submitted an inquiry through Defendant's AskHR portal and also contacted Defendant by email and telephone regarding her previously approved disability accommodation, return from FMLA leave, future FMLA usage, workload, case reassignment, PTO, and her concern that Defendant was retaliating against her for requesting and using disability

accommodations and protected leave. Plaintiff further complained that Defendant had imposed a more demanding workload after she requested disability accommodations and FMLA leave.

46. On July 10, 2025, Plaintiff spoke with VP Mixon and Sr. Mgr. Adams. During her conversation with Sr. Mgr. Adams, they discussed her PTO times which she advised were registered in Defendant's database as well as memorialized through her e-mails to Sr. Mgr. Adams. Plaintiff discussed her ADA accommodation with Sr. Mgr. Adams, including his awareness of the accommodation and the contents of her ADA accommodation despite his denials.

47. Mario Duran, Occupational Health Nurse ("Nurse Duran"), met with Plaintiff on July 15, 2025. Nurse Duran discussed Plaintiff's disability accommodation and FMLA issues and directed workload and corrective-action matters to Defendant's Workforce Solutions department.

***E. Defendant Creates and Publicly Stores a Coaching Memorandum Against Plaintiff***

48. On July 15, 2025, Ms. Colon discovered that Defendant had stored a draft Coaching Memorandum concerning her performance on Defendant's shared drive. After Sr. Mgr. Adams indicated that he did not have or had not seen her accommodation letter, Colon used Defendant's system-wide search function to search for her own ADA accommodation documents. The search results returned a file associated with Sr. Mgr. Adams containing Plaintiff's initials and employee identifier. Plaintiff opened the file believing it could relate to the accommodation documentation she was attempting to locate.

49. The memorandum contained Plaintiff's personal identifiers and information concerning her ADA accommodation, the terms of her disability-related alternative work schedule, and approved FMLA leave.

50. A subsequently modified version of the Coaching Memorandum imposed an SID "core hours" requirement that had not previously applied to Plaintiff's accommodated work

schedule. Colon had previously informed management that she did not want coworkers to know that her alternative work schedule was an ADA accommodation.

51. Plaintiff viewed the document's properties on her computer. It showed that the template was created on 07/15/2025 12:48 P.M. The document was renamed with identifiers related to Ms. Colon at 12:58 p.m. and then modified again at 2:13 P.M. It showed editing time of 1:17:00 and Sr. Mgr. Adams was the name of the last person who saved the document.

52. Defendant stored this memorandum containing confidential disability, accommodation, and leave information on a shared "G" drive accessible to SID employees and was not limited to Sr. Mgr. Adams or Plaintiff's direct supervisory chain; employees working in SID in other states could also access corresponding shared-drive information.

53. Defendant left this document without any locks or protections on the shared drive available to members of her department for ten days after Plaintiff reported it.

54. Plaintiff e-mailed the draft coaching memo to her direct supervisor (Adams) as well as Dir. O'Dea and VP Mixon.

55. On July 15, 2025, Plaintiff requested to speak with Nurse Duran and they discussed her concerns regarding her reasonable accommodations and she requested confirmation that her accommodation was still active with Defendant. Nurse Duran agreed to send Plaintiff's approved accommodation to her supervisor.

56. On July 16, 2025, Plaintiff requested an additional opportunity to speak through AskHR to discuss her concerns regarding her disability, return from FMLA leave, future FMLA usage, workload, case reassignment and PTO. She continued making requests through AskHR throughout the rest of July 2025.

57. On July 21, 2025, Nurse Duran sent Colon's approved accommodation letter to her supervisor.

58. From July 24, 2025, to August 14, 2025, Plaintiff sent multiple emails regarding her ADA accommodations and details regarding her FMLA leave. She contacted Manika Turnball, and Kelly Jacks, Senior Director Workforce Solutions/Human Resources. Ms. Jacks advised Plaintiff that she would address Plaintiff's concerns alongside human resources specialist Latoya Paschel. Plaintiff continued following up with Ms. Paschel and Mgr. Graham regarding solutions related to her ADA and FMLA concerns.

59. On July 24, 2025, the corrective action document showed that it was established and initiated by Defendant's Human Resources on July 24, 2025, at 9:38:55 A.M. This was before Human Resources had interviewed or spoken with Plaintiff regarding the matters on which the discipline was based.

60. On July 27, 2025, Nurse Duran confirmed to Colon that she was entitled and would need to use FMLA if she lacked available PTO and directed her to contact Defendant's FMLA department if she needed any assistance with requesting it.

61. The following day, Plaintiff and Nurse Duran discussed that her ADA accommodation paperwork did not indicate that her need for accommodation had an expiration date. Nurse Duran told her that only her and Sr. Mgr. Adams had a copy of the letter.

### *F. Plaintiff Files an EEOC Charge and Defendant Escalates Discipline*

62. On July 29, 2025, the Equal Employment Opportunity Commission received a Charge filed by Plaintiff regarding her (1) her ADA accommodation, (2) disproportionate case assignments, (3) denial of comparable help, (4) repeated disregard of her accommodation, and (5) the coaching memo/shared-drive issue.

63. On July 30, 2025, Defendant interviewed Plaintiff regarding her access to the Coaching Memo.

64. On the same day, Defendant issued Plaintiff with a formal corrective action written notice alleging performance, behavior, communication, case reassignment, and attendance concerns. It specifically claimed that she was not meeting her productivity goal of “aggressively detect[ing] and investigat[ing] fraud.”

65. Defendant’s July 30 Written Notice identified no prior related informal or formal corrective action against Plaintiff.

66. The Written Notice acknowledged Plaintiff’s “right as an employee to raise concerns,” but criticized her communications concerning those concerns as appearing “accusatory in nature” toward management and warned that such communications “will not be tolerated.”

67. Despite the formal written notice stating to the contrary, Defendant never discussed any issues regarding Plaintiff’s progression or closure times related to cases, a performance issue which resulted in the reassignment of a case to a peer, or the alleged verbal and written communication she made that was insubordinate or disrespectful.

68. Unlike the draft Coaching Memorandum Colon discovered earlier that month, the July 30 Written Notice constituted formal corrective action and warned that failure to satisfy Defendant's expectations or further misconduct could result in additional corrective action, up to and including termination.

69. The Written Notice also imposed, for the first time on Plaintiff, a requirement that she perform her 9.5-hour in-office workdays within specified “core” hours, including a 6:00 a.m. to 6:00 p.m. window.

70. Before the Written Notice, Plaintiff had not been subject to an SID policy requiring her to perform her accommodated schedule within those core hours. The Written Notice therefore imposed a new restriction on when Plaintiff could utilize her approved accommodation.

71. Approximately one week after imposing the core-hours requirement on Colon through the Written Notice, Defendant communicated a core-hours requirement to the broader SID Department.

72. In approximately July 2025, Plaintiff reviewed historical totals for amount of cases initiated by each of Defendant's senior and lead investigators based in Illinois. Defendant had assigned Plaintiff the highest amount out of fourteen investigators.

73. From 2016 to July 2025, Plaintiff opened nearly 300 matters. That was more than twice the number of matters opened than her peers (Ken Trask, Angela Swanson, Amechecon Blackwell, Derek Matheis) had opened *combined* from 2018-2022 (the only data set that she was able to view). Even accounting for the variance in timeframe, it is clear that Plaintiff was more productive than all of her immediate comparators.

74. Lifetime totals of case closures tell a similar story: Plaintiff closed nearly as many matters on her own as Trask, Swanson, Blackwell and Matheis combined.

75. On July 31, 2025, Kevin Graham, Defendant Compliance Manager ("Mgr. Graham"), emailed Plaintiff and requested that she review what she was working on that required her to access the draft coaching memo in a file publicly located on Defendant's share drive and provide a written explanation for why she did so by the end of the day, including any case numbers, files she was attempting to retrieve and supporting documentation to support her explanation.

76. Plaintiff responded to Mgr. Graham that she was beginning FMLA leave but would return on August 12, 2025, and could handle his request then.

77. Plaintiff returned to work and attended the SID Annual Training on August 12 and 13, 2025.

78. After her return, Mg. Graham renewed his demand for an explanation of how she found the Coaching Memorandum, and that Defendant was "past reasons for pause" and appeared to treat Plaintiff's leave as PTO. This was even though Plaintiff had explained to Mgr. Graham that she was taking FMLA leave and would respond upon returning,

79. Defendant admitted that not only did Sr. Mgr. Adams and Dir. O'Dea view the draft memorandum that included Plaintiff's confidential disability, accommodation, and leave information, but so did "investigators" outside of Plaintiff's supervisory chain.

***G. Defendant's Conduct Culminates in Plaintiff's Resignation***

80. In the weeks preceding her resignation, Plaintiff repeatedly sought assistance from Human Resources and management concerning her ADA accommodation, FMLA leave, workload, discipline, and retaliation concerns. These efforts did not resolve Plaintiff's concerns and the restrictions and disciplinary measures applied to Plaintiff escalated.

81. On August 25, 2025, Plaintiff submitted her resignation to Sr. Mgr. Adams, stating that she "cannot endure this for another two weeks." She identified the disproportionate workload; discrimination; retaliation; failure to properly address her complaints, continuous dismissal of her concerns, alleged escalation/intensification of discrimination and retaliation; restrictions on her ADA accommodation; and Defendant's treatment of her FMLA rights as reasons for her resignation.

82. Before resigning, Plaintiff attempted to determine whether she could continue working under the Written Notice. She believed that Defendant was escalating discipline toward

termination and that the restrictions imposed through the Written Notice materially impaired her ability to continue working under the terms of her previously approved accommodation.

83. On August 27, 2025, Sr. Mgr. Adams was coached and provided guidance on how and where to properly store confidential documents such as Coaching Memos. As such, the investigation was closed. Defendant also acknowledges that during the July 30 investigation Sr. Mgr. Adams said he "probably should not have stored the Coaching Memo on a shared drive that his direct reports could access." Defendant thereafter closed its investigation.

**COUNT 1**
**VIOLATION OF ADA (DISCRIMINATION)**

84. Plaintiff realleges and incorporates by reference paragraphs 1-83 as if fully set forth herein.

85. Plaintiff is a qualified individual with a disability. Her ADHD is a mental impairment that substantially limits one or more major life activities and therefore constitutes a disability within the meaning of the ADA.

86. Defendant knew of Plaintiff's disability and had approved multiple reasonable accommodations for that disability, including Plaintiff's 9.5-hour alternative work schedule.

87. Defendant discriminated against Plaintiff because of her disability in the terms, conditions, and privileges of her employment, including, among other things, by subjecting her to disparate treatment and formal corrective action and by treating her disability-related accommodation adversely in connection with the terms and conditions of her employment, not providing her with as much investigatory support as other similarly situated persons in her position, and assigning her more work than other similarly situated persons in her position.

88. Defendant's discriminatory treatment occurred despite Plaintiff's history of positive performance evaluations and the July 30, 2025, corrective action Written Notice expressly identifying no prior related informal or formal corrective action against Plaintiff.

89. Defendant subjected Plaintiff to formal corrective action while knowing that Plaintiff had a disability, that her 9.5-hour alternative work schedule was an ADA accommodation for that disability, and that the schedule had been approved and utilized for more than two years before Defendant imposed new restrictions upon it.

90. Multiple high-ranking agents of Defendant (including, at a minimum, Mr. Adams, Ms. O'Dea, Ms. Mixon, and Ms. Paschel) were aware of Plaintiff's complaints regarding Defendant's discriminatory conduct under the ADA (through Mr. Adams and otherwise) and failed to take adequate steps or corrective actions to remedy the discrimination and misconduct despite possessing the ability to do so.

91. Defendant's discriminatory treatment culminated in working conditions that became intolerable and resulted in Plaintiff's resignation effective August 26, 2025.

92. Defendant subjected Plaintiff to the foregoing discriminatory treatment because of her disability.

93. As a proximate and direct result of Defendant's conduct, Plaintiff has suffered, and will continue to suffer, damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities, in an amount to be determined at trial.

94. Defendant acted with malice or with reckless indifference to Plaintiff's protected rights. Therefore, Plaintiff is entitled to punitive damages to the extent permitted by law.

**COUNT 2**
**VIOLATION OF THE IHRA (DISABILITY DISCRIMINATION)**

95. Plaintiff realleges and incorporates by reference paragraphs 1-83 as if fully set forth herein.

96. Plaintiff is a qualified individual with a disability. Her ADHD is a mental impairment that substantially limits one or more major life activities and therefore constitutes a disability within the meaning of the IHRA.

97. Defendant knew of Plaintiff's disability and had approved multiple reasonable accommodations for that disability, including Plaintiff's 9.5-hour alternative work schedule.

98. Defendant discriminated against Plaintiff because of her disability in the terms, conditions, and privileges of her employment, including, among other things, by subjecting her to disparate treatment and formal corrective action and by treating her disability-related accommodation adversely in connection with the terms and conditions of her employment, not providing her with as much investigatory support as other similarly situated persons in her position; and assigning her more work than other similarly situated persons in her position.

99. Defendant's discriminatory treatment occurred despite Plaintiff's history of positive performance evaluations and the July 30, 2025, corrective action Written Notice expressly identifying no prior related informal or formal corrective action against Plaintiff.

100. Defendant subjected Plaintiff to formal corrective action while knowing that Plaintiff had a disability, that her 9.5-hour alternative work schedule was an IHRA accommodation for that disability, and that the schedule had been approved and utilized for more than two years before Defendant imposed new restrictions upon it.

101. Multiple high-ranking agents of Defendant (including, at a minimum, Sr. Mgr. Adams, Dir. O'Dea, VP. Mixon, and human resources specialist Paschel) were aware of Plaintiff's

complaints regarding Defendant's discriminatory conduct under the ADA (through Sr. Mgr. Adams and otherwise) and failed to take adequate steps or corrective actions to remedy the discrimination and misconduct despite possessing the ability to do so.

102. Defendant's discriminatory treatment culminated in working conditions that became intolerable and resulted in Plaintiff's resignation effective August 26, 2025.

103. Plaintiff's disability was a cause of Defendant's discriminatory treatment towards her.

104. As a proximate and direct result of Defendant's conduct, Plaintiff has suffered, and will continue to suffer, damages including emotional distress, inconvenience, loss of income and benefits, humiliation, and other indignities, in an amount to be determined at trial.

**COUNT 3**
**VIOLATION OF ADA (RETALIATION)**

105. Plaintiff realleges and incorporates by reference paragraphs 1-83 as if fully set forth herein.

106. Plaintiff is a qualified individual with a disability within the meaning of the ADA, and Defendant was fully aware of Plaintiff's disability.

107. Plaintiff requested and utilized reasonable accommodations for her disability during her employment.

108. In July 2025, Plaintiff repeatedly complained and engaged in opposition against Defendant concerning its discriminatory treatment of her, her ADA accommodation, and disability-related rights, including through communications with her supervisor, Human Resources, and Defendant's AskHR system.

109. On July 29, 2025, Plaintiff filed an EEOC Charge regarding disability discrimination and retaliation against Defendant.

110. Plaintiff's requests for accommodations, complaints and opposition to Defendant regarding disability discrimination, and filing of an EEOC Charge constitute protected acts under the ADA.

111. Defendant's management and Human Resources personnel, including Sr. Mgr. Adams, Dir. O'Dea, VP Mixon, and Human Resources Agent Paschel, were aware of Plaintiff's protected activities and complaints concerning her rights under the ADA.

112. Defendant took materially adverse action against Plaintiff following and because of her protected activity. Specifically, Defendant issued Plaintiff a formal corrective-action Written Notice on July 30, 2025. The Written Notice also imposed additional requirements on her employment, including requiring Plaintiff to perform her approved schedule during "SID core business hours."

113. The Written Notice expressly acknowledged Plaintiff's "right as an employee to raise concerns," but criticized her communications concerning those concerns as appearing "accusatory in nature" toward management and warned that such communications "will not be tolerated."

114. Defendant thereafter continued to subject Plaintiff to scrutiny and investigation concerning matters and subjects related to her complaints.

115. Defendant's retaliatory conduct culminated in working conditions that became objectively intolerable and resulted in Plaintiff's resignation effective August 26, 2025.

116. Defendant's knowledge of Plaintiff's protected activity, the close temporal proximity between that activity and Defendant's escalating corrective actions, the absence of prior related corrective action, and Defendant's express criticism of the manner in which Plaintiff raised

concerns support an inference of retaliation. Plaintiff's protected activity was a but-for cause of Defendant's materially adverse actions against her.

117. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff suffered damages, including lost income and benefits, emotional distress, inconvenience, humiliation, and other nonpecuniary losses. Defendant acted with malice or reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to compensatory and punitive damages and all other relief available under the ADA to the extent permitted by law.

**COUNT 4**
**VIOLATION OF IHRA (DISABILITY-BASED RETALIATION)**

118. Plaintiff realleges and incorporates by reference paragraphs 1-83 as if fully set forth herein.

119. Plaintiff is a qualified individual with a disability within the meaning of the IHRA, and Defendant was fully aware of Plaintiff's disability.

120. Plaintiff requested and utilized reasonable accommodations for her disability during her employment.

121. In July 2025, Plaintiff repeatedly complained and engaged in opposition against Defendant concerning its discriminatory treatment of her and her disability related accommodation, including through communications with her supervisor, Human Resources, and Defendant's AskHR system.

122. On July 29, 2025, Plaintiff filed an EEOC Charge regarding disability discrimination and retaliation against Defendant.

123. Plaintiff's requests for accommodations, complaints and opposition to Defendant regarding disability discrimination, and filing of an EEOC Charge constitute protected acts under the IHRA.

124. Defendant's management and Human Resources personnel, including Sr. Mgr. Adams, Dir. O'Dea, VP Mixon, and human resources specialist Paschel, were aware of Plaintiff's protected activities and complaints concerning her rights under the IHRA.

125. Defendant took adverse action against Plaintiff because of her protected acts under the IHRA. Specifically, Defendant issued a formal corrective action Written Notice against Plaintiff on July 30, 2025. The Written Notice also imposed additional requirements on her employment, including requiring Plaintiff to perform her approved schedule during "SID core business hours."

126. The Written Notice expressly acknowledged Plaintiff's "right as an employee to raise concerns," but criticized her communications concerning those concerns as appearing "accusatory in nature" toward management and warned that such communications "will not be tolerated."

127. Defendant thereafter continued to subject Plaintiff to scrutiny and investigation concerning matters and subjects related to her complaints.

128. Defendant's retaliatory conduct culminated in working conditions that became objectively intolerable and resulted in Plaintiff's resignation effective August 26, 2025.

129. Defendant's knowledge of Plaintiff's protected activity, the close temporal proximity between that activity and Defendant's escalating corrective actions, the absence of prior related corrective action, and Defendant's express criticism of the manner in which Plaintiff raised concerns support an inference of retaliation. Plaintiff's protected activity was a but-for cause of Defendant's materially adverse actions against her.

130. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff suffered damages, including lost income and benefits, emotional distress, inconvenience,

humiliation, and other nonpecuniary losses, and is entitled to all other relief available under the IHRA.

**COUNT 5**
**VIOLATION OF ADA**
**(UNLAWFUL DISCLOSURE OF CONFIDENTIAL MEDICAL INFORMATION)**

131. Plaintiff repeats and realleges Paragraphs 1-83 as if fully set forth herein.

132. In connection with Plaintiff's requests for reasonable accommodation, Plaintiff provided Defendant with medical documentation concerning her disability and disability-related limitations. Defendant reviewed information from Plaintiff's medical provider in determining whether and how to accommodate Plaintiff's disability.

133. The ADA required Defendant to maintain medical information obtained through its disability-related inquiry and accommodation process on separate forms and in separate medical files, to treat such information as a confidential medical record, and not to disclose such information except as authorized by law.

134. Defendant was independently aware of these confidentiality obligations. Defendant's own Accommodation Policy required Defendant to keep medical-related information confidential and to retain such information in separate confidential files.

135. On or about July 15, 2025, Plaintiff discovered that Defendant had stored a draft Coaching Memorandum on a shared drive accessible to SID employees. The Coaching Memorandum expressly identified Plaintiff as having an "ADA Accommodation" and disclosed the terms of her disability-related alternative work schedule, including her 9.5-hour workdays.

136. By storing the Coaching Memorandum containing Plaintiff's disability and accommodation information in a location accessible to SID employees beyond those with an

identified need to receive such information, Defendant failed to maintain the confidentiality of Plaintiff's protected medical information as required by the ADA.

137. Defendant subsequently acknowledged that Sr. Mgr. Adams, Dir. O'Dea, and "investigators" viewed the Coaching Memorandum. Defendant further acknowledged that Adams stated during its investigation that he "probably should not have stored the Coaching Memo on a shared drive that his direct reports could access."

138. The disclosure of Plaintiff's confidential disability and accommodation information to employees who did not need such information to administer Plaintiff's accommodation did not fall within an exception to the ADA's confidentiality requirements.

139. Defendant's disclosure was particularly harmful because Plaintiff had previously informed management that she did not want her coworkers to know that her alternative work schedule was an ADA accommodation. The disclosure revealed that Plaintiff had a disability and was receiving a disability-related accommodation.

140. As a direct and proximate result of Defendant's unlawful disclosure and failure to maintain the confidentiality of Plaintiff's disability-related information, Plaintiff suffered emotional distress, humiliation, embarrassment, anxiety, and other compensable injuries.

141. Defendant acted intentionally and with malice or reckless indifference to Plaintiff's federally protected rights, entitling Plaintiff to all remedies available under the ADA, including compensatory and punitive damages to the extent permitted by law.

**COUNT 6**
**VIOLATION OF FMLA (INTERFERENCE)**

142. Plaintiff realleges and incorporates by reference paragraphs 1-83 as if fully set forth herein.

143. Plaintiff was an eligible employee under the FMLA, Defendant was an employer covered by the FMLA, and Plaintiff was entitled to take FMLA leave to care for her daughter due to her daughter's serious health condition.

144. Plaintiff provided Defendant with sufficient notice of her need for FMLA leave, and Defendant approved Plaintiff for continuous FMLA leave from April 28, 2025 through June 6, 2025, as well as a subsequent period of FMLA leave.

145. The FMLA prohibits an employer from interfering with, restraining, or denying an employee's exercise or attempted exercise of FMLA rights, including by discouraging the use of FMLA leave or using an employee's FMLA leave as a negative factor in employment actions.

146. While Plaintiff was on approved FMLA leave, Defendant reassigned at least three of her cases, including an investigation Plaintiff had opened and substantially worked before beginning leave. Sr. Mgr. Adams also informed an individual outside SID that Plaintiff was on FMLA leave and indicated that the investigation could be reassigned if Plaintiff did not return promptly. Although Plaintiff timely returned following her approved leave, the investigation was nevertheless reassigned. Plaintiff's approved FMLA leave accounted for a substantial portion of the period Sr. Mgr. Adams characterized as involving "inconsistent work availability."

147. Defendant thereafter subjected Plaintiff to corrective action addressing her attendance, availability, and productivity during a period in which Plaintiff had exercised her right to take approved FMLA leave.

148. By considering Plaintiff's FMLA-protected absences negatively in connection with her employment and by interfering with, restraining, or discouraging the exercise of Plaintiff's FMLA rights, Defendant interfered with rights protected by the FMLA.

149. Defendant's interference with Plaintiff's FMLA rights prejudiced Plaintiff and caused her to suffer damages recoverable under the FMLA, including lost compensation and benefits and other monetary losses, in an amount to be determined at trial.

**COUNT 7**
**VIOLATION OF FMLA (RETALIATION)**

150. Plaintiff realleges and incorporates by reference paragraphs 1-83 as if fully set forth herein.

151. Plaintiff engaged in activity protected by the FMLA by requesting and taking approved FMLA leave to care for her daughter's serious health condition and by raising concerns regarding Defendant's treatment of her protected leave.

152. Defendant knew that Plaintiff had requested and utilized FMLA leave, including approximately five weeks of continuous FMLA leave from April 28, 2025 through June 6, 2025.

153. Shortly after Plaintiff returned from FMLA leave, among other things, Mr. Adams characterized Plaintiff's work availability during the preceding months as "inconsistent", questioned whether Plaintiff's ADA accommodation remained effective because she missed work due to taking FMLA leave, reassigned cases she had investigated time and resources into, and criticized her for not submitting information while on protected FMLA leave.

154. In July 2025, Plaintiff repeatedly complained to Defendant, including to Human Resources and through Defendant's AskHR system, concerning Defendant's treatment of her FMLA leave.

155. Following Plaintiff's exercise of FMLA rights and her complaints concerning Defendant's treatment of her protected leave, Defendant subjected Plaintiff to materially adverse treatment, including case reassignment, escalating scrutiny, and formal corrective action including

the July 30, 2025 Written Notice, despite Plaintiff's history of positive performance evaluations and the Written Notice's identification of no prior related informal or formal corrective action.

156. Defendant thereafter continued to subject Plaintiff to scrutiny and investigation concerning matters related to her complaints and FMLA-protected absences, including questioning Plaintiff concerning an absence that Plaintiff informed Defendant was FMLA leave rather than PTO.

157. Defendant's retaliatory conduct resulted in working conditions that became objectively intolerable and resulted in Plaintiff's resignation effective August 26, 2025.

158. Defendant's knowledge of Plaintiff's FMLA leave and complaints, the close temporal proximity between Plaintiff's exercise of FMLA rights and Defendant's escalating corrective actions, Mr. Adams's characterization of the period encompassing Plaintiff's protected leave as involving "inconsistent work availability," and the absence of prior related corrective action support an inference that Defendant retaliated against Plaintiff because she exercised her FMLA rights.

159. As a direct and proximate result of Defendant's unlawful retaliation, Plaintiff suffered damages, including lost income and benefits and other monetary losses, and is entitled to all relief available under the FMLA.

**PRAYER FOR RELIEF**

160. WHEREFORE, Plaintiff requests judgment in her favor and an award of the following:

a. All statutorily available damages pursuant to the ADA to the fullest extent permitted by law (including backpay, front pay, compensatory, and punitive damages);

b. All statutorily available damages pursuant to the IHRA to the fullest extent permitted by law (including backpay, front pay, and compensatory damages);

c. All statutorily available damages and equitable relief pursuant to the FMLA to the fullest extent permitted by law, including lost wages, salary, employment benefits, and other compensation; other actual monetary losses; interest; liquidated damages; and appropriate equitable relief, including front pay in lieu of reinstatement, as appropriate;

d. Award Plaintiff reasonable attorneys' fees and expenses against Defendant;

e. Pre-judgment and post-judgment interest; and

f. Such other relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiff demands a jury trial on all issues that are triable by a jury.

Dated: September 8, 2026

Respectfully submitted,

By: /s/ *Christopher S. Prater*
Christopher S. Prater, Esq.*
Florida Bar No.: 105488
cprater@pollardllc.com
**Member of N.D.I.L. General and Trial Bars*

**Pollard PLLC**
500 E. Broward Blvd., Ste 950
Fort Lauderdale, FL 33394
T: (954) 332-2380
F: (866) 594-7531

*Attorney for Plaintiff Lisete Colon*